MOHAWK PETROLEUM CORPORA-
TION, INC., Plaintiff-Appellee,

v.

DEPARTMENT OF the NAVY et al.,
Defendants-Appellants.

No. 9-27.

Temporary Emergency Court
of Appeals.

Aug. 26, 1975.

John H. Broadley, Atty., Dept. of Justice, with whom Rex E. Lee, Asst. Atty. Gen., and William C. White, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellants.

Girvan Peck, Morrison & Foerster, San Francisco, Cal., for appellee.

Before CARTER, HASTIE and CHRISTENSEN, Judges.

PER CURIAM:

The injunction from which this appeal has been taken requires the United States Department of the Navy to continue to supply crude oil to plaintiff Mohawk Petroleum Corporation (hereinafter, Mohawk), a refiner, pursuant to the terms of a 1970 contract between the parties "and at prices controlled and fixed by the Federal Energy Administration until and unless the regulations of said Federal Energy Administration shall be validly amended or modified to permit the discontinuance of said contract or the sale of such crude oil at prices other than the controlled and fixed prices".

The 1970 contract covered a limited quantity of crude oil, about 600 barrels a day, that the Navy then was and still is producing from the Elk Hills Petroleum Reserve and selling in the commercial market. The contract had been awarded pursuant to competitive bidding and was for a 5 year term expiring May 7, 1975. Shortly before the expiration date, the Navy Department proposed to sell this oil, from and after May 7, 1975, to another refiner which had offered to pay a price higher than that permitted by FEA regulations applicable to "old oil". To prevent this, Mohawk brought the present suit and obtained the injunction which the Navy, contrary to the views and wishes of the Federal Energy Administration, is now challenging on appeal.

Federal Energy Administration (hereinafter, FEA), has imposed a maximum price that may be charged for "old" domestic crude oil, the category within which the oil in suit falls, and has required generally that supplier/purchaser relationships as they existed December 1, 1973, shall remain in effect. 10 C.F.R. § 211.63. Moreover, a regulation issued by FEA in 1974, after notice and opportunity afforded interested persons

to be heard, determined and declared that "prices charged for any sale . . . of a covered product by any Federal department . . . are subject to the [mandatory] price regulations". 10 C.F.R. § 212.52. The regulation also subjected sales by state or municipal agencies to price controls. Beyond that, a formal statement issued with and in justification of this inclusive regulation recited and determined that the purposes of the emergency legislation, and particularly the assurance of a continuing supply of crude oil to small refiners at fair prices, would be served by making controls applicable to oil produced by federal, state or municipal agencies. 79 Fed. Reg. 12252.

■ We are unable to fault, and are not sure whether the Department of the Navy now faults, the administrative determination of the President's delegatee that the power which Congress had conferred upon the President to regulate the sale of "all" crude oil includes some power to regulate sales by federal agencies.[1] Indeed, this court recently held that FEA had validly subjected oil produced by the State of California to the emergency federal price controls by rescinding an earlier administrative exception that had exempted transactions of States and municipalities from regulation. *California v. Simon,* Em.App.1974, 504 F.2d 430. If a federal statute empowering the President to control "all" domestic oil covers oil produced by other sovereignties, *a fortiori,* it covers oil produced by the federal government over which Congress and the President exercise supreme and direct legislative and executive power.

■ A narrower contention of the Department of the Navy turns upon special legislation concerning the Naval Petroleum Reserve. In Chapter 641 of Title 10, United States Code, Congress has enacted a comprehensive scheme that entrusts possession, control and management of certain reserved public lands and the oil beneath them to the Department of the Navy. Chapter 641 makes clear and the Navy recognizes that the purpose of this enactment is to conserve an important energy resource for future national defense and to keep that resource in readiness for use whenever required. Moreover, to that end Congress expressly authorized limited production and sale of crude oil from the reserve as the Secretary of the Navy shall find necessary for "the protection, conservation, maintenance, and testing of those reserves". 10 U.S.C. § 7422(b)(1).

Concededly, the small production and sale now in controversy is designed to protect and test the reserve, and the Secretary deems it appropriate to continue this limited production and sale. Moreover, there is no contention that Mohawk's performance as purchaser has been unsatisfactory in any way. And finally, the amount of revenue produced by this sale is not a controlling consideration.

In these circumstances, it does not appear that mandating the continuation of the producer/supplier relation between Navy and Mohawk or restricting the purchase price to the ceiling price for old oil frustrates the purpose of Congress, interferes with conservation, protection or testing of the Naval Petroleum Reserve, or in any significant way impedes the Navy in carrying out its mission.[2]

---

1. For reasoning that supports this conclusion, see *National Association of Letter Carriers, AFL–CIO v. United States Postal Service,* D.D. C.1971, 333 F.Supp. 566, 568.

2. An argument is made that the mandatory allocation of oil to Mohawk and the imposition of a price ceiling violate a statutory requirement that naval sales from the petroleum reserve be by competitive bidding. 10 U.S.C. § 7430(b). Mohawk obtained its contract by competitive bidding and the mandatory continuation of the duly established producer/suppli-

er relation merely postponed new bidding somewhat beyond the contract's stated expiration date. More fundamentally, the obvious purpose of the requirement of competitive bidding is the avoidance of favoritism, or the appearance of favoritism, on the part of the seller. That purpose is in no way frustrated by generally applicable FEA restrictions upon allocation and price, one legislative and administrative objective of which is the protection of crude oil supply of small refiners during a period of extraordinary economic dislocation.

Accordingly, on the present record the district court properly found that the application of present price and allocation regulations to the contract between the Navy and Mohawk will not "substantially injure or adversely affect the conservation and maintenance of such reserves".[3] On the other hand, the court found that compliance with FEA controls would maintain "the economic viability of a small refiner during the present emergency" by continuing the supply upon which it depends. Moreover, it is significant that the written and oral submissions for the Navy in this case disclose major concern, not that the application of energy controls to the Mohawk contract will have any adverse affect upon conservation of the petroleum reserve, but rather that their application to its sales to some other purchaser or purchasers may be harmful.

We shall not undertake to determine in this case the impact or applicability of price or allocation regulations in circumstances or to transactions that are not in litigation here. Our reasons are several. No purchaser except Mohawk is before us to respond to any allegation that emergency price control in the context of its contract will be inimical to legislatively required conservation. Second, it seems all but certain that the Emergency Petroleum Allocation Act is about to expire of its own time limitation on August 31, 1975. And finally, in administering the Naval Petroleum Reserve, the Secretary of the Navy acts "subject to approval by the President", 10 U.S.C. § 7422, whom Congress also has charged with imposing and administering crude oil allocations and price controls. We think the risk is minimal that the President would or will permit his authority under the one statute to be misused to impair or jeopardize our national defense posture for which he is responsible under the other.

The injunction from which this appeal has been taken is affirmed.

---

3. While FEA has restricted the price the Navy may charge Mohawk for crude oil, it has not undertaken to control the amount of oil the Navy may produce from the reserves. We recognize that serious questions would arise under Chapter 641 of Title 10 if an FEA regulation should impinge upon the discretion Congress has conferred upon the Secretary of the Navy to determine whether or to what extent production from the reserves is needed for testing or is consistent with conservation.